E. T. MOHR, *etc.*

*v.*

THE COUNTY COURT OF CABELL COUNTY, *etc., et al.*

(No. 11094)

Submitted May 4, 1960.     Decided June 28, 1960.

*Russell L. Daugherty, Maxwell W. Flesher, William I. Flesher, John W. Daniel,* for appellants.

*Sam R. Harshbarger,* for appellees.

*W. W. Barron,* Attorney General, *Henry C. Bias, Jr.,* Assistant Attorney General, amicus curiae for Donald C. Carman, State Tax Commissioner for State of West Virginia.

CALHOUN, JUDGE:

This suit in chancery was instituted in the Circuit Court of Cabell County by E. T. Mohr, on behalf of himself and all other taxpayers and persons similarly situated in and of the County of Cabell and State of West Virginia, against The County Court of Cabell County, West Virginia, a corporation, and T. A. Cavendish, Frank Heiner and G. Y. Neal, commissioners of said court. Jim Ellis and Vinson V. DeVilbiss, subsequent commissioners of said court, William Cleminshaw and Harvey G. Cleminshaw, partners trading and doing business under the firm name and style of The J. M. Cleminshaw Company, and Harold H. Gorman, assignee of the partnership, were subsequently made parties defendant by court decree.

The object of the suit is to prohibit the County Court of Cabell County and the several commissioners thereof from paying to The J. M. Cleminshaw Company, or its assignee, any sum under the terms of two certain contracts in writing, which are made exhibits with the bill of complaint, by the terms of which The J. M. Cleminshaw Company, for the sum of $164,750, agreed to assist the county court "in making a revaluation of real property within the limits of Cabell County, West Virginia, for assessment and tax purposes." The revaluation has been completed, and the county court has paid The J. M. Cleminshaw Company the sum of $123,958, leaving an unpaid balance of $40,792.

The initial contract, executed on August 24, 1956, recites that the partnership "is engaged in appraisal work for public bodies"; and that it is the intent of the agreement "to provide that the completed appraisal shall serve as a basis for assessments * * *." In the supplemental contract, executed July 2, 1957, the partnership agreed to "complete all work of appraisal and revaluation * * * on or before November 1, 1957," for which services the county court agreed to "pay a total which when added to what has already been paid will equal One Hundred Sixty Four Thousand, Seven Hundred Fifty Dollars ($164,-750.00)."

The contract dated August 24, 1956, is lengthy, containing forty-six numbered paragraphs. After reciting that "the County Court wishes the Partnership to assist it in making a revaluation of real property within the limits of Cabell County, West Virginia, for assessment and tax purposes", and that "the Partnership is engaged in appraisal work for public bodies and desires to assist in such revaluation", the contract contains extensive and detailed provisions reciting methods to be adhered to in making the revaluation. Other portions of the contract are as follows:

> "The Partnership will assist the County Court in appraising and making a revaluation of the real

property within the limits of Cabell County in the manner hereinafter set forth:

\* \* \*

"32. Copies of all real estate cost data and valuation tables, dwelling valuation tables and cost data covering commercial construction shall be left with the Assessor or the County Court for their use and benefit in connection with valuations of Cabell County. Instruction shall be offered in the use of said data so that the system may be maintained through future years. One current edition of 'The Cleminshaw Appraisers' Manual' shall be furnished supplemental to the above cost data.

\* \* \*

"35. Provide for full instructions to the Assessor in the use of cost and valuation tables, formulas and standards used in this revaluation.

\* \* \*

"The County Court does hereby agree as follows:

"41. That it will render every assistance it can in securing the aid and co-operation of the Cabell County Assessor and his staff as well as the aid and assistance of all other county officials where proper and necessary in the performance of this agreement, and that it will make possible access to official records pertinent to this program."

The bill of complaint, as amended, challenges the legality of the written contracts as follows:

"\* \* \* Any contract by which assessment and revaluation were attempted to be accomplished by a county court was a contract that a county court had no power or authority to make, was *ultra vires,* and therefore, void."

The county court and the commissioners thereof, jointly and severally demurred to and answered the amended bill of complaint, to which answer the plaintiff demurred. The answer contains the following allegations:

"I. That prior to the execution of the contracts marked in said Bill as 'Exhibit A' and 'Exhibit B' Cabell County has lost in excess of $700,000.00 in School Aid from the State of West Virginia because

of alleged findings of the Tax Commissioner of the State of West Virginia that property valuations on real property within said County were not sufficient and adequate to make said County eligible for the maximum allocation of State Aid for schools, as determined and provided by Chapter 18, Article 9A, Section 1, et seq., West Virginia Code.

"That the County Court of Cabell County, a corporation, was advised by the Tax Commissioner of the State of West Virginia that, pursuant to his investigation of real property valuations in said County, which investigations were made as required by Chapter 11, Article 1, Section 2, Chapter 18, Article 9A, Section 3, et seq., West Virginia Code, it was his opinion that the County Court of Cabell County, a corporation, in accordance with the law would lie under a duty to revalue or re-appraise all real estate within said County subject to taxation, excepting public utility property, and to equalize many discrepancies in property valuation then existing.

"That the County Court of Cabell County, a corporation, acting upon such advice, and like advice from the Attorney General of the State of West Virginia and the Prosecuting Attorney of Cabell County, West Virginia, proceeded to undertake the task of obtaining competent, skilled and expert appraisers and subsequently entered into a contract for such services after first submitting such to the Tax Commissioner of the State of West Virginia, the Attorney General of West Virginia, and the Prosecuting Attorney of Cabell County, West Virginia."

By a decree entered on July 11, 1958, "counsel for the plaintiff and counsel for the defendants stipulated and agreed in open court that all facts well pleaded in the said Bill of Complaint and said Joint and Several Answer were true and no proof would be submitted at the hearing on the merits of this cause unless required by the court." The decree further provided that "the matters of law therein contained shall be decided on the pleadings filed herein."

On May 4, 1959, the court entered a decree overruling the defendants' demurrer to the plaintiff's bill and amended bills of complaint; sustaining the plaintiff's demurrer to the defendants' answer; declaring

that the two written contracts "are hereby adjudged and decreed to be null and void"; making the trial court's written opinion a part of the record; and enjoining the county court and the several commissioners thereof "from paying any sums of money to defendants * * * or to anyone on behalf of them or any one or more of them, in or about the said two contracts, * * *.''

The petition filed in this Court embodies eight assignments of error, but counsel for the defendants agree that all of such assignments of error involve the single question of the validity or invalidity of the contracts.

The distinguished trial chancellor, as is evidenced by his written opinion, held that the county court had no legal right or authority to enter into the contracts in question in the absence of *express* authority and that authority to do so could not be implied, citing as authority for that proposition the following cases: *State, etc. v. Shipman*, 112 W. Va. 529, 165 S. E. 801; *Woodyard Publications, Inc., et al. v. Lambert*, 112 W. Va. 22, 163 S. E. 858; *Norris v. County Court of Cabell County*, 111 W. Va. 692, 163 S. E. 418; and *State, etc. v. County Court of Lewis County*, 110 W. Va. 533, 158 S. E. 790. The opinions in those cases refer to and are based upon a statute heretofore in existence which provided in part: "It shall be unlawful for any county court, * * * to expend any money or to incur any obligation or indebtedness which such fiscal body is not *expressly* authorized by law to expend or incur." (Italics supplied). Official Code, 1931, 11-8-13, (Barnes' West Virginia Code, 1923, Chapter 28A, Section 12).

The statute referred to immediately above was repealed and reenacted on January 19, 1934, by Chapter 67, Acts of the Legislature, Second Extraordinary Session, 1933, by which repeal and reenactment the language prohibiting county courts and certain other fiscal bodies from expending money or incurring any

obligation or indebtedness "not expressly authorized by law" was eliminated. We are unable to find that any provision of similar import is now to be found anywhere in the Code. Present limitations on the authority of such fiscal bodies are found in Code, 11-8-25, 26 and 27. We cannot assume that the Legislature acted unwittingly and without purpose in eliminating the statutory provision in question.

The prohibitory language in question, contained in Code, 11-8-13, until the reenactment thereof in 1934, made it unlawful for the fiscal bodies therein enumerated *"to expend any money or to incur any obligation or indebtedness"* not expressly authorized by law. The next sentence in the same statute dealt in a different manner with the making by such fiscal bodies of "any contract, express or implied." The apparent result of the statutory language was that, even during the time such prohibitory language was a part of the statutory law, there remained an area in which such fiscal bodies were authorized to exercise implied authority, in the absence of express authorization. In some areas at least, county courts possessed such powers as were expressly conferred by the Constitution or by the Legislature, *"together with such as are reasonably and necessarily implied* in the full and proper exercise of the powers so expressly given." (Italics supplied.) *Barbor v. County Court of Mercer County,* 85 W. Va. 359, syl. 3, 101 S. E. 721. See also *Keatley v. Summers County Court,* 70 W. Va. 267, 73 S. E. 706; *Adkins v. Wayne County Court,* 94 W. Va. 460, 119 S. E. 284; *Old, etc. v. Commonwealth,* 148 Va. 299, 138 S. E. 485. The rule relative to implied authority, as applied to boards of education, is stated in *Dooley v. Board of Education,* 80 W. Va. 648, 93 S. E. 766. See also *State v. Rouzer,* 127 W. Va. 392, 397, 32 S. E. 2d 865, 867. The rule, as it relates to municipal corporation, is stated in *Law v. Phillips,* 136 W. Va. 761, syl. 8, 68 S. E. 2d 452, and in numerous prior decisions therein listed.

The rule relating to implied powers of county courts, or other similar fiscal bodies for counties, apparently

is applied almost universally in the absence of constitutional or statutory restriction. "It is well settled that a county board possesses and can exercise such powers, and such powers only, as are expressly conferred on it by the constitution or statutes of the state, or *such powers as arise by necessary implication from those expressly granted or such as are requisite to the performance of the duties which are imposed on it by law. It must necessarily possess an authority commensurate with its public trusts and duties.*" 20 C.J.S., Counties, Section 82, pages 850-51. See also 14 Am. Jur., Counties, Section 28, page 200, and Section 40, page 209. "Explicit powers necessarily include implicit powers reasonably incidental and indispensable to their proper exercise and to accomplish the purpose of the creation and existence of the body to whom granted, and the object to be attained or achieved." *Edwards v. Logan County,* 244 Ky. 296, 50 S. W. 2d 83.

Code, 7-1-3, lists numerous powers expressly conferred on county courts and contains the following language: "They shall * * * have the superintendence and administration of the internal police and fiscal affairs of their counties * * * with authority to lay and disburse the county levies." Code, 7-1-5, as amended, imposes upon county courts numerous duties, including the duty "to review and equalize the assessments made by the assessor; to inspect and review the lists of property, both real and personal, made up by the assessor and his deputies for taxable purposes, and to point out to the assessor any property, real or personal, which the said assessors of their respective counties may have overlooked or omitted to place on said tax lists; * * * to * * * supervise the general management of the fiscal affairs and business of each county; * * *." Code, 11-3-24, as amended, contains the following language:

> "The county court shall annually, not later than the fifth day of July, meet for the purpose of reviewing and equalizing the assessment made by the assessor. * * * The court shall proceed to examine and review the property books, and shall add on the

books the names of persons, the value of personal property and the description and value of real estate liable to assessment which was omitted by the assessor. They shall correct all errors in the names of persons, in the description and valuation of property, and they shall cause to be done whatever else may be necessary to make the valuation comply with the provisions of this chapter. * * * If the court determine that any property or interest is assessed at more or less than its true and actual value, it shall fix it at the true and actual value. * * * When it is desired to increase the entire valuation in any one district by a general increase, notice shall be given by publication in two newspapers published in the county, once each week for two consecutive weeks, and completed at least five days prior to the increase in valuation."

While the specific question here involved has not been considered and decided by this Court heretofore, similar questions have been decided by appellate courts of other jurisdictions. In the case of *Federal Royalty Co. v. State,* (Tex. Civ. App.), 42 S. W. 2d 670, a firm of experts had been employed on behalf of Pecos County to make a survey and report of real estate to aid the board of commissioners sitting as a board of equalization in determining proper values to be fixed for tax assessment purposes and in equalizing such values. The assessor accepted the valuations thus determined without personal knowledge of the facts and the valuations were accepted in like manner by the board of equalization. A taxpayer challenged the legality of the assessment. In holding that the assessment was proper the Court said (42 S. W. 2d at page 674): "The aid contracted for is in the exercise of the powers and duties imposed by law upon the assessor of taxes and the commissioners sitting as a board in the matter of listing and assessment of property for taxation in the county where situate. Where, as in this state, no express authority is given to employ such expert aid, the power to do so is implied, and the expedience of doing so is within the discretion of the commissioners' court."

The situation in the case of *Haley & Co. v. McVay,* 70 Cal. App. 438, 233 P. 409, was similar to that in the

instant case. In the California case the board of supervisors of Del Norte County had employed Haley & Company to make an investigation of real estate and a report of its findings to aid the board of supervisors, sitting as a board of equalization, in the equalization of tax assessments within the county. In holding that the contract was valid and legally enforceable, the Court stated (233 P. at page 411): "The data contracted to be furnished was for the purpose of enabling the supervisors intelligently to perform their duties as a board of equalization. It is true that the assessor may make use of such data in assessing property during succeeding years, but he may likewise make a similar use of any adjustment made by the board in the equalization of assessments, whatever the data may be upon which such adjustment may be made. It may be presumed that the assessor will be guided by the adjustments made by the board rather than by the data upon which such adjustments are based." Similar cases and similar decisions are found in *Speer v. Kratzenstein,* 143 Neb. 310, 12 N. W. 2d 360, and *Arnold v. Custer County,* 83 Mont. 130, 269 P. 396. On February 6, 1946, Ira J. Partlow, attorney general, rendered a formal opinion upholding the validity and legality of a contract such as that in question herein. See Forty-first Biennial Report and Official Opinions of the Attorney General of the State of West Virginia, 1945-46, pages 147 and 150.

We are not concerned with the expediency of the contracts in question, nor with the wisdom exercised by members of the county court in entering into them. We do note, however, the allegations of the answer of the county court, which allegations are accepted as true in the light of the demurrer thereto, that prior to the making of such contracts Cabell County lost in excess of $700,000 in school aid from the State of West Virginia "because of alleged findings of the Tax Commissioner of the State of West Virginia that property valuations on real property within said County were not sufficient and adequate to make said County eligi-

ble for the maximum allocation of State Aid for schools, as determined and provided by Chapter 18, Article 9A, Section 1, et seq., West Virginia Code.''

The Court holds that because of the broad and comprehensive nature of powers expressly granted to and duties expressly imposed upon the county court by the Legislature, the county court had implied power and authority to enter into the written contracts in question in this case; and that, therefore, such contracts are valid, binding upon the parties thereto and legally enforceable. In holding that the contracts are valid and enforceable, we note that the valuations fixed by the partnership under the terms of such contracts are designed merely to serve as a guide to the assessor and to the county court in the performance of the duties imposed upon them by law; and that such contracts do not impose a mandatory obligation upon the assessor and county court to accept such valuations for tax purposes.

For the reasons stated herein, the judgment of the Circuit Court of Cabell County is reversed and the case is remanded to that court with direction to dissolve the injunction granted as a part of that judgment.

*Reversed and remanded with direction.*

GIVEN, JUDGE, concurring:

I agree with the final disposition of this case, but think that the contract in question was, in fact, made only for the benefit of the county court, for its use in the discharge of its duties in relation to the equalization of tax assessments in Cabell County.

The pertinent statutes, especially the several sections of Article 3 of Chapter 11 of the Code, as amended, clearly, I think, impose on the assessor the absolute and sole duty of making the initial assessment of all taxable property in his county, excepting, of course, such assessments as are required to be made by the board of public works. For that purpose the

assessor is authorized to employ such assistants and deputy assessors as may be necessary to accomplish the work. In such circumstances, I believe no implied power or authority exists to enable him to enter into, or to have made for his benefit, for such purpose, any contract authorizing independent or unofficial help to do, or to assist in, the work required of his public office. To hold otherwise, in my view, would permit an official to evade his duties, at double expense to the taxpayers, by contracting for the performance of the very duties imposed on him by law.

There is, however, imposed on the county court the absolute duty of "equalizing the assessment made by the assessor". Code, 11-3-24, as amended. No specific directions as to the manner of discharging such duties are found, the road to the accomplishing or performance of such duties seemingly being left open to be determined by that body. The importance of such duties is emphasized by the constitutional provision requiring that "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law." It can hardly be contended that the three members of the county court would, without assistance from some source, be able to accomplish true equalization of the many thousands of assessments, including those from the smallest to large industrial and manufacturing plants, in a county such as Cabell, or indeed in any county, where a need existed or is demanded by circumstances such as presently exist in Cabell County, for an examination of all or a large part of the properties for the purpose of such equalization, within the time available for the performance of the work. This being true, it would seem clear that there exists, of necessity, implied authority for the execution of the contract.

While it is true that certain language contained in the contract is subject to an interpretation to the effect that it was made for the purposes relating to duties exclusively imposed on the assessor, a fair determina-

tion of the meaning is, I believe, that it was made for the purpose of truly equalizing assessments. Supporting such view are the facts that the county court alone entered into the contract with Cleminshaw; that the stated purpose of the contract was to "assist the County Court in appraising and making a revaluation of the real property"; that the contract required that representatives of Cleminshaw "be present at the meetings of the Board of Equalization and Review"; and that the county court would render assistance "in securing the aid and cooperation of the" assessor. It appears not significant that the assessor was to have access to, or the advantages of, the work reports of Cleminshaw. That, to me, was merely an effort to coordinate and simplify the duties common to the county court and the assessor. There were certainly imposed no duties or obligations on the assessor to forego his official and independent duties of making the initial assessments.

HAYMOND, JUDGE, dissenting:

I can not concur in the decision of the majority which dissolves the injunction issued by the circuit court and sustains the validity of agreements by the county court to pay a private concern from public funds the sum of $164,750.00 for its assistance in the performance of duties which the statutes of this State impose upon the members of the county court and the assessor of Cabell County. As in my opinion the county court is without authority to make any contract for such services and to pay, in addition to the fixed salaries of its members and the assessor, compensation in an amount which is not fixed by law or regulations and is limited only by the agreement of the parties and the amount of the surplus in the general fund of the county and, as the action of the county court tends to encourage the nonperformance by those public officers of their statutory duties and in effect permits the delegation of the performance of such duties to private persons at an additional unnecessary, unwarranted and publicly unknown cost to the taxpayers of the

county, which will inevitably prove disastrously wasteful in the proper administration of its public moneys, I emphatically register my dissent.

I have searched diligently, but in vain, for any statutory provision which expressly, or impliedly, authorized the county court to make any contract of the nature of the contracts involved in this case. Counsel representing the respective parties to this litigation, in their argument in this Court, in effect concede that such contracts were not expressly authorized by the provisions of any statute of this State and counsel for the defendants seek to sustain the validity of the contracts by the county court on the ground that it had implied authority to make them. The majority opinion fails to cite or mention any statute which expressly confers such authority upon the county court. Yet despite the foregoing position of counsel and the silence of the majority opinion with respect to the disclosure of any such express authority in the county court, point 2 of the syllabus, which states the legal principle applied by the majority and on which it bases its conclusion, contains the actually unsupported statement that ''A county court, because of the powers expressly given to it and the duties expressly enjoined upon it by the Constitution and Legislature, has the right to enter into'' the written contracts here under consideration. Contrast the statements in the foregoing quotation from the syllabus with these statements in the last paragraph but one of the opinion of the majority: ''The Court holds that because of the broad and comprehensive nature of powers expressly granted to and duties expressly imposed upon the county court by the Legislature, *the county court had the implied power and authority* to enter into the written contracts in question in this case, and that, *therefore,* such contracts are valid, binding upon the parties thereto and legally enforcible.'' (Emphasis supplied.)

I deny the existence of any such expressly given power or authority, and I challenge the existence of

any legal power or authority whatsoever, either express or implied, in the county court to enter into such contracts at the time they were made. I agree with the statement concerning "the duties expressly enjoined upon it" in point 2 of the syllabus and the statement concerning the "duties expressly imposed upon the county court by the Legislature," in the next to the last paragraph of the opinion; but my view of the meaning and the application of the constitutional and statutory provisions which "expressly enjoin" and "expressly impose" such duties is that those duties must be performed by the county court and not by some other outside private agency at considerable cost in addition to the amount of the compensation fixed, limited and provided by law for the services required of the members of the county court, the salary for each of whom in Cabell County is the sum of three hundred dollars per month, fixed by Section 5(6), Article 1, Chapter 7, Code, 1931, as amended. The power and the authority conferred upon the county court, whether express or implied, are conferred upon it, not upon some other agency, and are to be exercised by it, and not by some other agency either gratuitously or at an additional cost to the taxpayers, and they are not to be and they can not lawfully be delegated, transferred or farmed out to any other agency.

In its labored effort to reach and justify its conclusion the majority refers to and relies upon the practically identical provisions of Article VIII, Section 24, of the Constitution and of Section 3, Article 1, Chapter 7, Code, 1931, that county courts "shall also, under such regulations as are now or may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills, with authority to lay and disburse county levies"; certain provisions of Section 5, Article 1, Chapter 7, Code, 1931, as amended; and the provisions of Section 24, Article 3, Chapter 11, Code, 1931, as amended, that

"The county court shall annually, not later than the fifth day of July, meet for the purpose of *reviewing and equalizing the assessment made by the assessor.* It shall not adjourn for longer than three days at a time until this work is completed, and shall not remain in session for a longer period than twenty-five days, * * * . The court shall proceed to *examine and review* the property books, and shall add on the books the names of persons, the value of personal property and the description and value of real estate liable to assessment *which was omitted by the assessor.* They shall correct all errors in the names of persons, in the description and valuation of property, and they shall cause to be done whatever else may be necessary to make the valuation comply with the provisions of this chapter. * * * ."

I earnestly insist that the language in none of these provisions confers authority or power upon a county court to contract and pay any private person to do or perform any of the enumerated acts or duties for and in behalf of either the county court or the assessor of the county. None of these provisions mentions the word contract or the right to contract for the performance of any specified act or duty.

The general authority of the county court conferred by Article VIII, Section 24, of the Constitution and by Section 3, Article 1, Chapter 7, Code, 1931, to superintend and administer the internal police and the fiscal affairs of the county is expressly limited by the provision "under such regulations as may be prescribed by law," and such authority specifically includes the subjects of roads, ways, bridges, public landings, ferries and mills, and the laying and the disbursement of the county levies. Certainly the language used can not by any stretch of imagination or distorted or tortured construction be considered, expressly or impliedly, to apply to the making of a contract for the employment of a private agency for its exercise of such authority. If the general provision relating to superintendence and administration of the

internal police and fiscal affairs is considered as a grant of unlimited authority in that governmental area, the county court could waste and dissipate at will and for any whimsical private purpose the public funds entrusted to its care; and this, we know, it can not do. Its power and authority are expressly restricted by the phrase "under such regulations as may be prescribed by law." The authority to lay and disburse county levies likewise can not, by implication, be stretched to authorize the contracts here in question.

On the question of the power and the authority of the county court this Court has held in numerous cases that a county court, a corporation created by statute, can do only such things as the law authorizes it to do, and that it must act in the manner prescribed by law. *Daugherty v. Ellis,* 142 W. Va. 340, 97 S. E. 2d 33; *Ryan v. The County Court of Monongalia County,* 108 W. Va. 404, 151 S. E. 315; *State v. Larue,* 98 W. Va. 677, 128 S. E. 116; *Barbor v. County Court of Mercer County,* 85 W. Va. 359, 101 S. E. 721; *Goshorn's Ex'rs v. County Court of Kanawha County,* 42 W. Va. 735, 26 S. E. 452. In the *Barbor* case this Court used this pertinent language with regard to the authority of the county court: "Its specific authority, however is only such as the Constitution and legislature of the state have seen fit to bestow upon it. 'The county court is a corporation created by statute, and can do only such things as are authorized by law, and in the mode prescribed.' *Goshorn's Ex'rs v. County Court,* 42 W. Va. 735, pt. 5, Syl. It has only such powers as are expressly conferred by the legislature, and such as are necessarily implied in the full and proper exercise of those powers expressly given. *Keatley v. County Court,* 70 W. Va. 267, 275. The Constitution and Code of this state (section 24, Art. 8, Const.; section 9, ch. 39, Code), after an enumeration of certain powers not important here, provide: 'They (county courts) shall also, under such regulations as now are or may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs

of their counties, * * * .' Thus, with respect to the internal police affairs, such as the supervision and care of the poor of the county, *the powers of the county courts are not inherent,* but are limited and restricted by regulations prescribed by law, * * * ." (Emphasis supplied).

The provisions of Section 5, Article 1, Chapter 7, Code, 1931, as amended, concerning the numerous duties imposed upon the county court by that section, quoted in the majority opinion, relate only to some, not to all such duties, and an examination of all the provisions of the section indicates clearly that the duties imposed, concerning the assessment and valuation of property, are to be performed by it with respect to matters pertaining to the work, in the first instance of the county assessor, while acting as a board of review and equalization. The provisions of the section relative to those subjects impose these specific duties upon the county court: "to attend the annual meeting of county assessors, and such district meetings as may be called by the state tax commissioner, on matters pertaining to *the work of the county assessors and the county courts as boards of review and equalization; to review and equalize assessments made by the assessor;* to inspect and *review* the lists of property, both real and personal, *made up by the assessor and his deputies,* for taxable purposes, and *to point out to the assessor* any property, real or personal, which the *said assessors* of their respective counties may have overlooked or omitted to place on said *tax lists; to call to the attention of the assessor* all real estate or personal property belonging to churches, lodges, schools or other charitable institutions which may have been overlooked or omitted by the *assessor or his deputies* in making up his lists of property for entry on the land and personal property books; * * * ." (Emphasis supplied.) The same section also provides that compensation, in addition to his salary, which is, of course, expressly fixed and limited by law, shall be allowed and paid to each county commissioner for performing

the specific duties set forth in the prior provisions of the section just quoted.

It is clear, from the various provisions of the section quoted and referred to, that the duties specified are to be performed, by the county court, not in the first instance, but as a reviewing authority of the work originally performed by the assessor of the county and his deputies which by Section 2, Article 2, Chapter 11, Code, 1931, as amended, he is authorized to select and whose salaries are fixed by the county court as provided by Section 7, Article 7, Chapter 7, Code, 1931, as amended; and the salary of the assessor for each county is fixed and specified by Sections 5(1) to 5(35), Article 2, Chapter 11, Code, 1931, as amended, and for the assessor of Cabell County is the sum of five thousand dollars per year. Manifestly the provisions which authorize additional compensation for the members of the county court for the performance of the specific duties imposed mean that such duties shall be performed by them, in reviewing the work of the assessor, not by some other person for them, and that their performance can not be delegated, transferred or farmed out by contract to any other person.

The provisions of Section 24, Article 3, Chapter 11, Code, 1931, as amended, quoted in the majority opinion, also relate to the county court while meeting not later than the fifth day of July in each year for the purpose of reviewing the work of the assessor in assessing and valuing the property in the county. The provisions that the county court shall correct all errors in the names of persons and in the description and valuation of property and shall cause to be done whatever else may be necessary to make the valuations comply with the provisions of that chapter, in my opinion, clearly and only mean that the county court during its sessions to review the work of the assessor, shall make the designated corrections and at that time take such action as may be necessary for that purpose. Certainly the clear and unambiguous provisions of that section of the statute, by the most strained or tortuous con-

struction, can not mean that the county court at the time of its reviewing sessions or at any other time, under the phrase ''and they shall cause to be done whatever else may be necessary to make the valuation comply with the provisions of this chapter'', has the power or the authority to assess and value, in the first instance, the property of the county for taxable purposes. That power is conferred, and that duty is imposed, not upon the county court but upon the assessor and his deputies, by Section 2, of the same article and chapter, which provides in part that: ''On the first day of January in each year, the assessors and their deputies shall begin the work of assessment in their respective counties, and shall, from that date, diligently and continuously pursue with reasonable dispatch, their work of assessment until the same is completed.'' Section 1, Article 3, Chapter 11, Code, 1931, as amended, provides that: ''If at any time after the beginning of the assessment year, it be ascertained by the tax commissioner that the assessor, or any of his deputies, is not complying with this provision or that he has failed, neglected or refused, or is failing, neglecting or refusing after five days' notice to list and assess all property therein at its true and actual value, the tax commissioner may order and direct a reassessment of any or all the property in any county, district or municipality, where any assessor, or deputy, fails, neglects or refuses to assess the property in the manner herein provided. And, for the purpose of making such assessment and correction of values, the tax commissioner may appoint one or more special assessors, as necessity may require, to make such assessment in any such county * * *. The tax commissioner shall, with the approval of the board of public works, fix the compensation of all such special assessors as may be designated by him, which, together with their actual expenses, shall be paid out of the county fund by the county court of the county. * * * .''

It is obvious that under the foregoing sections the tax commissioner, not the county court, can assess and

value property for taxation, and appoint and fix the compensation of special assessors appointed for that purpose when the assessor and his deputies whose duty it is in the first instance to assess and value such property at its true and actual value fail or refuse to perform that duty; and that the only power of the county court in connection with the assessment and valuation of property for taxation is to correct the assessment and the valuation made by the assessor, in the first instance, and in so doing the county court acts as a reviewing and equalizing instrumentality at sessions of a meeting to be held annually at the time and for the limited period fixed by the statute. If the county court can not, in the first instance, assess and value property for taxable purposes, but can only review and correct the assessment and the valuation made by the assessor, it is impossible, at least for me, to understand how it obtained or had the power and the authority, either express or implied, by contract to employ and pay private persons as experts to appraise and value property for taxable purposes for either itself or the assessor. And even if it could assess and value property for taxation instead of correcting the work of the assessor upon review, it would have to do so itself for, when the contracts in question were made, no statutory power and authority had been conferred upon it to delegate, transfer or farm out such power and authority to any private person or agency or to pay extra compensation to such person or agency for its exercise of such power and authority.

Under the provisions of Section 2, Article 1, Chapter 11, Code, 1931, as amended, in effect when the challenged contracts were made, the tax commissioner, not the county court, is the only official who is authorized to appoint private persons to appraise property values for taxable purposes. That section expressly provides, in part, that: "The tax commissioner may, with the approval of the board of public works, appoint competent persons to appraise property values, and may employ experts to examine and report upon the dif-

ferent kinds and classes of property in the State, with a view to ascertaining the true and actual value thereof for assessment purposes, to the end that *he* may furnish to county assessors, county courts and the state board of public works more accurate information, and more effectively aid and supervise the assessors and the county courts in their work of assessment and valuation of property for purposes of taxation. * * * ." (Emphasis supplied). As the tax commissioner has been expressly given this power and authority by the foregoing provision of the statute there was no necessity for the Legislature to confer such power and authority upon the county court, and it is manifest that for that reason no such power and authority, express or implied, had been conferred upon or existed in the county court when the contracts here involved were made.

As already pointed out, a county court, a corporation created by statute, can do only such things as the law authorizes it to do and its powers are not inherent but are limited and restricted by regulations prescribed by law. *Barbor v. County Court of Mercer County,* 85 W. Va. 359, 101 S. E. 721. In the leading case of *Exchange Bank of Virginia v. County of Lewis,* 28 W. Va. 273, this Court, speaking of county courts as corporations, used this pertinent and clearly applicable language: " * * * counties are at most local organizations, which for the purpose of civil administration are invested with a *few functions* of a *corporate* existence; created almost exclusively with a view to the policy of the State at large in the administration of justice, the support of the poor and the establishment and repair of public highways. The public statutes confer on them *all the powers* they possess, prescribe all the duties they owe, and enforce all the liabilities to which they are subject. As corporate bodies of limited powers they rank *very low* down in the grade of corporate existence, and hence they are often called *quasi* corporations. (1 Dill, Mun. Corporations, sec. 18.25) In the construction of the powers, granted to them the

courts adopt a strict rather than a liberal construction, the rule being, that, where any ambiguity or doubt exists arising out of the terms used by the legislature, it must be resolved in favor of the public.''

My considered conclusion that there was no statutory power or authority, either express or implied, in the county court of Cabell County to enter into the contracts here in question, and that such contracts are invalid and unenforceable, is supported by the action of the Legislature at its 1958 Regular Session in enacting Chapter 15 of the Acts at that session, which for the first time attempts to authorize the county courts to participate more fully in an equalization and revaluation program and to expend funds for such program from funds in excess of the amount needed for the purpose for which they were raised. Section 25a, Article 8, Chapter 15, Acts, 1958, Regular Session, an amendment to Sections 25 and 26, Article 8, Chapter 11, Code, 1931, the constitutionality of which, in addition to its vicious character, seems to me to be doubtful, effective from its passage, February 4, 1958, provides that: ''In order to permit county courts to participate more fully in an equalization and revaluation program, which equalization and revaluation would result in increased local support for the public schools, any county court having funds in excess of the amounts needed for the purpose for which such funds were raised, may expend such funds for any equalization and revaluation program upon the written approval of the state tax commissioner, provided that under no circumstances shall a county court expend money or incur obligations in excess of funds available for current expenses.'' This statute was not in effect when the contracts here in suit were made and, of course, if valid, which I doubt, can not authorize or validate those contracts. The enactment of this statute in 1958 shows clearly that prior to its passage no power or authority, express or implied, to make those contracts resided in or was possessed by a county court. For if there was such existent power or authority the

enactment of that statute was unnecessary and the Legislature would not have committed the unnecessary and useless act of passing it.

This Court has held that the Legislature, in the enactment of a statute, must be presumed to have acted with full knowledge of the provisions of all prior statutes dealing with the same subject matter. Point 1, syllabus, *State v. Jackson,* 120 W. Va. 521, 199 S. E. 876. In the opinion in that case there is this quotation from 1 Lewis' Sutherland Statutory Construction (2d Ed.), p. 459, sec. 246: "Laws are presumed to be passed with deliberation, and with a full knowledge of all existing ones on the same subject." Many statements to the same effect appear in these decisions of this Court: *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars,* 144 W. Va. 137, 107 S. E. 2d 353; *State ex rel. Fox v. Brewster,* 140 W. Va. 235, 84 S. E. 2d 231; *Marion v. Chandler,* 139 W. Va. 596, 81 S. E. 2d 89; *Vest v. Cobb,* 138 W. Va. 660, 76 S. E. 2d 885; *State ex rel. Fanning v. The County Court of Mercer County,* 129 W. Va. 584, 41 S. E. 2d 855; *State v. Hinkle,* 129 W. Va. 393, 41 S. E. 2d 107; *State ex rel. The County Court of Berkeley County v. Keedy,* 124 W. Va. 408, 20 S. E. 2d 468; *State v. Jackson,* 120 W. Va. 521, 199 S. E. 876; *Hall v. Baylous,* 109 W. Va. 1, 153 S. E. 293, 69 A.L.R. 527; *State v. Snyder,* 64 W. Va. 659, 63 S. E. 385; *Reeves v. Ross,* 62 W. Va. 7, 57 S. E. 284; *Webb v. Ritter,* 60 W. Va. 193, 54 S. E. 484. See also 82 C.J.S., Statutes, Section 316. It is also presumed that the Legislature intended to enact a valid, effective and permanent statute. *Meisel v. Tri-State Airport Authority,* 135 W. Va. 528, 64 S. E. 2d 32; *Harbert v. The County Court of Harrison County,* 129 W. Va. 54, 39 S. E. 2d 177. There is also a presumption that the Legislature will not enact absurd, useless, impractical or meaningless legislation. 82 C.J.S., Statutes, Section 316. In *Williams v. Commonwealth,* 190 Va. 280, 56 S. E. 2d 537, the Supreme Court of Virginia, discussing a statute of that State, said: "The statute must have meant something

or it would not have been enacted. We must assume that the legislature did not intend to do a vain and useless thing." If the county courts had the power or the authority, express or implied, to make the contracts challenged in this suit, the Legislature of this State, contrary to all recognized legal presumption, certainly did "a vain and useless thing" in enacting, in 1958, Section 25a, Article 8, Chapter 15, of the Acts of its Regular Session of that year. I have awaited in vain an explanation of this "vain and useless" action by the Legislature, but the opinion of the majority is strangely and utterly silent on the subject. Of course, under the foregoing authorities which give effect to the presumption just heretofore mentioned, the only sound, correct and logical conclusion to be drawn from the enactment of Section 25a at the 1958 Regular Session is that the Legislature knew that until that time no power or authority, express or implied, existed in a county court to make a contract of the character of those made by the County Court of Cabell County to hire and pay for the services of a private person or agency to make an appraisal and revaluation of property for taxable purposes for the county court or the assessor; that it intended, for the first time, to confer that power and authority by the enactment of the statute; and that in its enactment the Legislature did not intend to do, or do, a "vain and useless thing." In my judgment there is no escape from that conclusion.

Section 26, Article 8, Chapter 11, Code, 1931, as amended, before it was amended by Section 26, Article 8, Chapter 15, Acts of the Legislature, 1958, Regular Session, provided in part that "A local fiscal body shall not expend money or incur obligations (1) in an unauthorized manner; (2) for an unauthorized purpose; * * *." As the county court was without authority to enter into the challenged contracts at the time they were made, under the above quoted statutory provisions, such contracts provided for the expenditure of money "in an unauthorized manner" and "for

an unauthorized purpose", and were for that reason invalid and unenforceable as the circuit court correctly held them to be. When it enacted Section 26 of the Act of 1958, the Legislature knew that such action was unauthorized both in manner and purpose, and by the new Section 26 expressly provided that "Except as provided in the next preceding section" of the Act, which was Section 25a, "a local fiscal body shall not expend money or incur obligations: (1) In an unauthorized manner; (2) For an unauthorized purpose; * * * ." By the new Section 26, the Legislature in 1958 intended to authorize the theretofore unauthorized manner and unauthorized purpose of the challenged contracts which required the expenditure of money and incurred the contract obligations. If such action was not previously unauthorized, the Legislature would not have enacted the new Section 26 in its amended form. That conclusion, too, is inescapable. The same comment and argument apply to the amendment to Section 25, Article 8, Chapter 11, Code, 1931, as amended, by the new Section 25, Article 8, Chapter 15, Acts of the Legislature, 1958, Regular Session. Before the amendment Section 25 provided that "Boards or officers expending funds derived from the levying of taxes shall expend funds only for the purposes for which they are raised." The new Section 25 makes this significant change by these provisions: "Except as otherwise provided in this article, boards or officers expending funds derived from levying taxes shall expend the funds only for the purposes for which they were raised."

Prior to the creation in 1904, of the office of tax commissioner, Chapter 4, Section 1, Acts of the Legislature, 1904, Extraordinary Session, the policy of this State from 1866 to 1904, with respect to the reassessment of real estate for taxation was to require such reassessment to be made by a commissioner or commissioners appointed to such office by a county board of supervisors, the governor, the auditor, or the board of public works. In  at least one

instance a special assistant was appointed to perform the work of the commissioner under his direction. In every such instance, except one, the appointee was required to take an oath of office and to give bond for the faithful discharge of his duties and the compensation for his services was fixed and prescribed by law, or by the public officer who made the appointment. See Sections 1, 2 and 8, Chapter 51, Acts of the Legislature, 1866, Regular Session; Sections 1, 2 and 8, Chapter 220, Acts of the Legislature, 1872-73, Regular Sessions; Sections 8 and 74, Chapter 54, Acts of the Legislature, 1875, Regular Session; Sections 1, 2 and 8, Chapter 36, Acts of the Legislature, 1891, Regular Session; Sections 1, 2 and 8, Chapter 21, Acts of the Legislature, 1899, Regular Session; and Sections 2, 3 and 11, Chapter 15, Acts of the Legislature, 1904, Extraordinary Session. Those acts of the Legislature required the work of reassessment to be performed by public officers appointed for the purpose at a fixed and limited cost, measured by the salaries designated for them by law, which I regard as a sound and essential public policy from which no departure should be made, instead of the present unsound and perilous policy exemplified by the challenged contracts of permitting such work to be done by private persons or agencies at an additional cost which when incurred is unknown to the public, is not fixed by law or regulation, and is limited only by the amount of the unexpended surplus remaining in the general fund of the county however large such fund may be.

Those earlier Acts of the Legislature are significantly and impressively indicative of the salutary traditional public policy of this State to specify the particular power and authority conferred and the particular duties imposed upon the various public officers entrusted with the assessment and valuation of property for taxation, the collection of taxes, and the administration and expenditure of the public funds levied and raised by taxation, and the strict requirements concerning the exercise of such power and au-

thority in the discharge of such duties. I view with concern and refuse to sanction any departure from that salutary policy by judicial pronouncement.

The majority seeks to sustain its decision in this case by four cases from other jurisdictions cited in its opinion, namely: *Federal Royalty Company v. State* (Court of Civil Appeals of Texas), 42 S. W. 2d 670; *H. D. Haley and Company of California v. McVay* (District Court of Appeal, Third District of California), 233 P. 409; *Speer v. Kratzenstein*, 143 Neb. 310, 12 N. W. 2d 360; and *Arnold v. Custer County*, 83 Mont. 130, 269 P. 396. It also cites and relies upon a 1945-1946 opinion of the attorney general of this State in the forty first Biennial Report and Official Opinions of that officer. All of the four cited cases are based upon statutes which contain different provisions from the applicable statutory provisions of this State. The decisions in the Texas and California cases are decisions of intermediate appellate courts and are not decisions of the appellate courts of last resort in those States. In the Nebraska case the Supreme Court of that State in its first decision of the case held unanimously that "A county board is without authority in the absence of grant to perform the duties which are a part of the official duties of other officials or boards," that "A county board is without power to enter into a contract for the appraisal of real estate for the use of the county board of equalization"; and that "A contract entered into by a county board in excess of its powers is void as an obligation against the county." Headnotes 4, 5 and 7, *Speer v. Kratzenstein*, 143 Neb. 300, 9 N. W. 2d 306. Later, on rehearing, however, the same court reversed its earlier holding and held such contract valid. In my judgment the first decision was the only correct decision and should have been adhered to by the Court. At any rate its completely opposite holdings within the short period between April 23 and December 21, 1943, and its surprising about face on a rehearing of the same case, give rise to doubt of the soundness of

its second decision and remove from the final decision most, if not all, of its weight and cogency as a judicial pronouncement. I am not convinced that it is sound or correct and I can not accept it as a precedent to be followed by any court of this State. In its final decision, however, the court, considering the statutes of that State, held in headnote 3 that "The statutes of this state, with certain specific exceptions therein provided, confer upon a county board plenary jurisdiction of, and authority to make, all contracts for the county on any subject within the scope of the powers of such county acting as a body corporate or politic." Of course, if the statutes of that State, unlike those of this State, confer upon a county agency plenary power to enter into a contract for the appraisal of property for the use of another county board or agency, such contract would be valid in Nebraska but a similar contract would be invalid in West Virginia; and the scope of the Nebraska statutory provision is not persuasive or controlling in the proper decision of the case at bar. The facts in the Montana case render it inapplicable in the decision of the instant suit. There a board of county commissioners employed an abstracting company, at a claimed cost of about $4,990.00, to abstract the title to real estate purchased by the county at a delinquent tax sale in an effort to ascertain certain information necessary to obtain deeds for the purchased property. The contract was upheld as valid under the particular statutes of that State but the Court held in headnote 2 that "A county governing board may contract to have work done that is necessary to its care and management of business and affairs of county and preservation of county property, if law does not make it duty of some county official to do such work." I do not disagree with that statement of law, but it is inapplicable to the facts of the case at bar. Here the duty to assess and value property is specifically imposed on the assessor and his deputies, in the first instance, and the authority to make a reassessment in the event he fails or neglects to discharge his duties, is specifically conferred upon the tax commis-

sioner, and neither such duty nor such authority was by any statute imposed or conferred upon the county court when the challenged contracts were made.

But whatever may be the effect of the decisions in the four cited cases, they are not binding but only persuasive authority to be accepted or rejected by the courts of this State as they may see fit to do. In any event, if the courts of Texas, California, Nebraska and Montana conclude that a contract to employ private persons or agencies at an agreed additional cost to perform the duties imposed by law upon public officers in the field of taxation and finance, is valid, that is their affair and their responsibility but, in my judgment, it furnishes no convincing reasons and affords no sufficient justification for the pursuit of a similar policy in such matters in this State.

The opinion of the attorney general, also cited and relied upon by the majority, though entitled to weight and consideration, is merely the individual official view of that high executive legal advisor and law enforcement officer of this State, and is not in any sense authority binding upon this Court. During the course of the years this Court has in some instances accepted the opinion of the attorney general and agreed with his views and conclusions, and in other instances has rejected them and completely disagreed with his views and conclusions. In this instance I completely disagree with and regard as unsound the conclusion stated in the cited opinion.

Though this Court in the decision of this or any other case is not concerned with the wisdom or lack of wisdom of the applicable statutes or the policy or attitude of the county court in making the challenged contracts, but is concerned only with the question of the power and the authority of the county court in that regard, certain allegations in the answer of the county court seek to justify its action and create the impression that because of such contracts Cabell County will gain, or will not lose, approximately $700,000.00 in school aid because the valuations of real property

within the county were not sufficient and adequate to make that county eligible for the maximum allocation of state aid for schools under the provisions of Article 9A, Chapter 18, Code, 1931, as amended. My answer to this contention, which I consider conclusive, is that if the services provided for in the contracts are performed by the officers charged by law with the duty of their performance, who should be and undoubtedly are more familiar with the actual values of property in their own local communities than any nonresident expert could, at least in the first instance, possibly be, the foregoing sum of money could be obtained for the amount of their salaries without incurring the considerable additional, and in my judgment entirely unnecessary, cost of approximately $165,000.00 for the performance of the same service by a private agency. If in each of the fifty five counties of this State the cost of such service by private persons should be approximately $165,000.00 to gain or save $700,000.00 in school aid the total state wide increased tax load on already heavily burdened taxpayers would amount to an unnecessary expenditure of approximately $9,000,-000.00 to obtain the sum of approximately $38,500,-000.00, or a cost of about 24% of the additional amount so obtained. In my judgment the mere statement of such contention calls for its complete and emphatic rejection for surely there is a less costly way, by the utilization of the services of the proper public officers in the performance of their legally imposed duties, to accomplish the result of obtaining the additional amount of $38,500,000.00 in the desirable and laudable endeavor to increase the amount of state aid to the schools of this state.

Of course, all possible progress and improvement in the development of the educational system of this State should be made but such progress and improvement should be accomplished in the manner provided by law. Any departure from that method would impair and prevent the achievement of one of the most important goals of education which is the improvement

of the administration of the affairs of government, and would necessarily defeat the ultimate objective and the great purpose of education to contribute to the preservation and maintenance of the right of every person to enjoy happiness and the blessings of liberty under law.

I wish to emphasize that no statement in this dissenting opinion concerning the duties imposed upon the county court or the assessor and the requirement that they be performed by those officers instead of by some other person for them is intended or should in any wise be considered as any reflection upon or criticism of the competent and faithful public servants who occupy those public offices in this State. On the contrary any and all such statements are intended only to call such duties to their attention, to explain the nature of such duties, and to indicate what they should and should not do, in order that they may know the scope and the character of the duties they are required to perform and the manner of their performance.

For the reasons stated, I would affirm the final decree of the Circuit Court of Cabell County and reinstate and perpetuate the injunction which would prevent the enforcement of the challenged contracts and the payment of the contract price of $164,750.00, or any part of it, for the services of the private person or agency provided for in such contracts.